# Illinois Official Reports

## Appellate Court

***Mitchell v. Stonecasters, LLC*, 2018 IL App (2d) 180127**

| | |
|---|---|
| Appellate Court Caption | ROBERT MITCHELL, Plaintiff-Appellant, v. STONECASTERS, LLC, a/k/a Henri Studio; FRANK HONOLD; and JOSEPH MODICA & ASSOCIATES, LTD., Defendants (Joseph Modica & Associates, Ltd., Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-18-0127 |
| Filed | November 13, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 15-L-610; the Hon. Dorothy French Mallen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jacqueline J. Helm and Stephen D. Helm, of Helm & Wagner, of Naperville, for appellant.<br><br>Thomas Falkenberg, of Falkenberg Ives LLP, of Chicago, for appellee. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Robert Mitchell, appeals an order dismissing his professional negligence claim against defendant, Joseph Modica & Associates, Ltd., as time-barred. For the reasons that follow, we affirm.

## I. BACKGROUND

¶ 2

¶ 3 Stonecasters, LLC (Stonecasters), manufactures garden decor and furnishings. Frank Honold is Stonecasters' president. From late 2012 through early 2013, plaintiff and Honold discussed plaintiff becoming both an employee and part-owner of Stonecasters. Those negotiations came to fruition in April 2013, when plaintiff began working for Stonecasters and purchased an 11.5% interest in the company. According to plaintiff, the $149,500 purchase price that he paid was based in large part on prior transactions of membership interests within the company.

¶ 4 In August 2013, plaintiff and Stonecasters executed a written employment agreement. That agreement obligated Stonecasters to repurchase plaintiff's interest at fair market value in the event of his termination. Such value would be determined "by a company valuation expert acceptable to the Employer and the Employee that is an investment banking firm, a firm of independent public accountants, or an appraiser who meets the requirements set forth in Treasury Regulation § 301.6501(c)-1(f)(3)(i) (a 'Qualified Appraiser')." The agreement gave plaintiff and Stonecasters each the right to select one "Qualified Appraiser." Those two "Qualified Appraisers" would then jointly select another "Qualified Appraiser," who would ultimately be solely responsible for determining the fair market value of plaintiff's interest at the time of termination.

¶ 5 During the course of his employment with Stonecasters, plaintiff allegedly received information from Honold indicating that the company was improving financially.

¶ 6 Stonecasters terminated plaintiff without cause on October 24, 2014. Pursuant to the employment agreement, plaintiff and Stonecasters selected their respective "Qualified Appraisers." Stonecasters chose Jeff Smiejek, and plaintiff chose Mary Lynn Hoffer. Smiejek and Hoffer, in turn, selected Joseph Modica of Joseph Modica & Associates, Ltd., to value plaintiff's interest. (For ease of reference, we will refer to Joseph Modica and also to his company as "Modica," although we recognize that plaintiff ultimately sued the corporate entity, not Joseph Modica individually.) Modica was a certified public accountant (CPA) as well as a certified valuation analyst.

¶ 7 On January 9, 2015, Modica issued a report opining that the fair market value of plaintiff's interest in Stonecasters at the time of his termination was $13,000. Modica was aware that certain individuals other than plaintiff had acquired or sold ownership interests in the company during 2013. According to the report, however:

> "Management does not believe these transactions are relevant in determining the buy-out price of [plaintiff's] ownership interest. As a result, they have chosen not to disclose the terms of these transactions. Therefore, we have not considered the prior sales of the Company's stock in determining Stonecasters' fair market value. Had this approach been considered, it may have affected our conclusions of the fair market value for the subject interest."

¶ 8        Plaintiff believed that the $13,000 appraised value was much too low. It seems that plaintiff enlisted Hoffer to review Modica's report, because the record contains an e-mail that Hoffer sent to Modica on February 10, 2015. In that e-mail, Hoffer indicated that she was "consulting with one of [her] tax clients (Bob Mitchell) on a matter that concerns [Modica's] valuation on [*sic*] Stonecasters, LLC." Hoffer asked Modica a number of questions about his report. For example, she questioned whether Modica had considered all of Stonecasters' assets:

> "Page 27 of your report contains the following qualification:
>
> > 'It should be noted, the only fixed assets listed on Stonecasters' balance sheet are a power sweeper, an auger, and software. There is no other furniture, fixtures, machinery or equipment listed. Therefore, our estimate does not include any assets other than the sweeper, auger, and software. To the extent other assets are owned by the Company, and possess a market value, their fair market values should be added to our estimate.'
>
> > (a) Do you have additional information regarding unrecorded equipment and other fixed assets?
>
> > (b) Did you request or suggest that the company obtain an equipment appraisal since you found it necessary to rely on the asset approach?
>
> > (c) Did you review the purchase accounting when Stonecasters was organized in 2012 and come to any conclusions about the details of the assets acquired at that date?"

On February 18, 2015, Modica sent Hoffer a letter responding to her questions. The letter indicates that a copy was sent to what appears to be plaintiff's e-mail address.

¶ 9        On June 26, 2015, plaintiff filed his original complaint against Stonecasters for breach of contract. According to the complaint, after unfairly manipulating and withholding critical information from Modica, Stonecasters used Modica's "distorted opinion of value" to deny plaintiff fair payment for his interest in the company. Plaintiff sought damages from Stonecasters in the amount of "the difference between the true termination value as of October 2014 and the $13,000.00 amount which Stonecasters offered," plus certain costs and expenses allowed by the employment agreement.

¶ 10        On July 29, 2016, plaintiff filed a two-count first amended complaint against Stonecasters. Plaintiff alleged fraud in that Stonecasters induced him to invest in the company in 2013 by concealing negative financial information. In his breach-of-contract count, which was pleaded in the alternative to the fraud count, plaintiff alleged that Stonecasters refused to provide Modica with relevant information during his valuation of plaintiff's interest.

¶ 11        According to plaintiff, prior to July 21, 2017, although he disagreed with Modica's valuation report, he believed that Stonecasters had procured Modica's "unfavorable opinion" by withholding information. On that day, however, as part of the discovery relating to his action against Stonecasters, plaintiff learned of a December 30, 2014, e-mail exchange between Honold and Modica. Plaintiff believed that this exchange evidenced a "deceptive scheme and cover-up" between Honold and Modica, which allowed Stonecasters to buy out plaintiff's interest at less than 10 cents on the dollar.

¶ 12        Specifically, at 12:31 p.m. on December 30, 2014, Honold wrote the following e-mail to Modica:

"Hi Joe, I'm looking for the documentation we discussed.

Just so we're clear, our transaction with [a prior member of Stonecasters] was a negotiation to get him out of the partnership. It was a toxic relationship.

It had nothing to do with market value as is stated in our contract with [plaintiff]. The parameters for [plaintiff's] case are spelled out pretty clearly in his employment agreement, which requires that the value of his membership interest equal his *pro rata* share of the amount that would be distributable with respect to the membership interests in the company if the company were sold as a going concern in an orderly transaction designed to maximize the proceeds of the sale, without discount for illiquidity or minority interest (*i.e.*, for a price that includes good will). Unless the parties can agree on the [fair market value], the determine [*sic*] is to be made by a third party appraiser within thirty days after his termination date.

Please let me know any other questions.

Best Regards."

At 10:34 p.m., Modica responded:

"Frank,

I really do understand your comments. However, there are really only two options: (1) I review the terms of the previous buy-out and explain why it is or isn't an indication of the current value; or (2) I comment that there was a prior buy-out however the terms were not disclosed because management does not believe it is relevant.

I am ok addressing it either way."

Nineteen minutes later, Honold replied: "We'll go with option 2 then. Thank you Joe. Best Regards."

¶ 13    On October 27, 2017, plaintiff filed a second amended complaint. Counts I and II—which asserted breach of contract against Stonecasters and breach of fiduciary duty against Honold, respectively—are not at issue in this appeal. In count III, which alleged professional negligence against Modica, plaintiff criticized Modica for resorting to a "net asset" valuation approach instead of applying a "market" approach. Additionally, according to plaintiff, Modica's "net asset" approach was flawed insofar as Modica should have known from his own observations of Stonecasters' facilities that Stonecasters possessed additional assets that were not included in the valuation. Furthermore, plaintiff alleged that Modica knew or should have known, through his consultations with Stonecasters' management, that the price plaintiff paid for his interest in 2013 was based in part on prior company transactions. Those transactions thus should have been taken into account as part of the valuation process. Plaintiff further criticized Modica for failing to accurately state in his report the true circumstances surrounding Stonecasters' refusal to produce relevant documentation during the valuation process. Plaintiff maintained that the true circumstances were reflected in the December 30, 2014, e-mail exchange between Modica and Honold.

¶ 14    Plaintiff alleged that Modica breached the standards promulgated by the National Association of Certified Valuators and Analysts (NACVA) in numerous ways, including (1) "misrepresenting the financial status of Stonecasters and subrogating judgment on what would be considered to Honold"; (2) "failing to obtain adequate documentation as was requested prior to completing his valuation"; (3) "failing to obtain sufficient relevant data on the financial status of Stonecasters prior to his valuation"; (4) "failing to avoid bias in favor of

- 4 -

Stonecasters in determining his valuation conclusion"; (5) "failing to apply his professional judgment and select an appropriate method of valuation," insofar as Modica "wrongfully avoided using an appropriate market valuation method" by "allowing Honold to instruct him not to consider prior sales of company stock"; (6) "refusing to consider any [of] Stonecasters['] assets except the power-sweeper, augur and software, which prompted Modica to include a unique limiting factor and assumption, and wrongfully prevented him from using an appropriate asset-based valuation method"; (7) "failing to obtain and analyze prior sales of interests in Stonecasters as one of the required sources of information for any member of NACVA to accomplish an assignment"; (8) "misrepresent[ing] that prior sales of company stock were considered, despite explicitly stating later in the report that he did not consider any prior sales due to the request of Stonecasters' management"; (9) "certify[ing] that his report had been prepared in conformity with NACVA standards despite numerous failings and inconsistencies"; (10) "disregarding the prior sales of interests within Stonecasters as market evidence to be considered in his valuation of [plaintiff's] membership interest"; and (11) knowingly and deceptively "fail[ing] to disclose the true facts concerning the company's decision to not disclose the prior sale transactions." Had Modica conducted the valuation in a manner that was consistent with the applicable professional standards, plaintiff believed, Modica would have valued plaintiff's interest in Stonecasters substantially higher than $13,000.

¶ 15 Modica moved to dismiss count III of the second amended complaint pursuant to section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2016)), arguing that the claim was not commenced within the time limited by law. Modica maintained that the following statute of limitations, contained in section 13-214.2(a) of the Code, applied:

> "Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2 years from the time the person bringing an action knew or should reasonably have known of such act or omission." 735 ILCS 5/13-214.2(a) (West 2016).

According to Modica, plaintiff was "fully aware of his alleged injury on January 9, 2015 when Modica completed [the] valuation and issued [the] valuation report." At the very least, Modica asserted, plaintiff was aware of his injury by June 26, 2015, when he filed his original complaint against Stonecasters. Because plaintiff did not file any claim against Modica until October 27, 2017, Modica contended that count III was untimely.

¶ 16 In his response to Modica's motion, plaintiff argued that "Modica was acting in his appraisal capacity, not in an accounting capacity," when he valued plaintiff's interest in Stonecasters. Therefore, the accounting statute of limitations did not apply, and the claim was instead subject to the five-year statute of limitations governing "all civil actions not otherwise provided for." 735 ILCS 5/13-205 (West 2016). Irrespective of whether the limitations period was two years or five years, plaintiff insisted that he did not discover any wrongdoing by Modica until July 21, 2017, when he obtained a copy of the December 2014 e-mail exchange.

¶ 17 Following a hearing, the court dismissed Modica from the action with prejudice. The court made findings rendering the order immediately appealable in accordance with Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). Plaintiff timely appealed.

II. ANALYSIS

¶ 19    The parties address two issues: (1) whether the two-year statute of limitations contained in section 13-214.2(a) of the Code applies to plaintiff's claim against Modica and (2) if so, whether plaintiff's claim was untimely as a matter of law.

¶ 20    The court dismissed plaintiff's professional negligence claim as untimely pursuant to section 2-619(a)(5) of the Code. "A section 2-619 motion to dismiss admits as true all well-pleaded facts in the complaint, together with all reasonable inferences gleaned from those facts." *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 18. The court was required to interpret all pleadings and supporting documents in the light most favorable to plaintiff, as the nonmoving party. *Khan*, 2012 IL 112219, ¶ 18. Modica had the burden of proving his affirmative defense of untimeliness, and the motion should have been granted only if the record established that no genuine issue of material fact existed. *Federated Industries, Inc. v. Reisin*, 402 Ill. App. 3d 23, 27 (2010). Our review is *de novo*. *Reisin*, 402 Ill. App. 3d at 27.

## A. Which Statute of Limitations Applies?

¶ 22    The parties dispute whether the accounting statute of limitations contained in section 13-214.2(a) of the Code applies to plaintiff's claim against Modica. Plaintiff reiterates his position that (1) Modica "has dual professions" as an appraiser and as an accountant and (2) Modica was acting as an appraiser, not an accountant, when he valued plaintiff's ownership interest in Stonecasters. Therefore, plaintiff maintains, the five-year statute of limitations governing "all civil actions not otherwise provided for" (735 ILCS 5/13-205 (West 2016)) applies. He submits that a defendant who happens to be an accountant should not benefit from the shorter limitations period unless he or she was actually providing "services in the nature of an accountant" at the time of the act or omission giving rise to the claim. Were that not the case, plaintiff hypothesizes, "an accountant who had a second profession as an electrician or a plumber could claim the benefit of § 214.2(a) if he or she wrongfully caused injuries in performing electrical or plumbing services."

¶ 23    Modica responds that the two-year statute of limitations embodied in section 13-214.2(a) applies to all actions against registered accountants. Moreover, he argues, valuation services fall neatly within the scope of his professional services as an accountant. To that end, he notes that the Illinois Public Accounting Act defines "accountancy activities" broadly to include "financial or consulting services" (225 ILCS 450/8.05(a)(3) (West 2016)) and that both Illinois and foreign authorities recognize that accountants offer a variety of professional services.[1] Modica also stresses that he personally adheres to the standards promulgated by the American Institute of Certified Public Accountants (AICPA) when he conducts business valuations.

¶ 24    As noted above, section 13-214.2(a) of the Code provides:

> "Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2

---

[1]One of the Illinois cases that Modica discusses is an unpublished order. We remind counsel that unpublished orders "may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e)(1) (eff. Apr. 1, 2018).

years from the time the person bringing an action knew or should reasonably have known of such act or omission." 735 ILCS 5/13-214.2(a) (West 2016).

The parties agree that, at all relevant times, Modica was registered pursuant to the Illinois Public Accounting Act. They disagree, however, as to whether Modica was providing "professional services" within the meaning of this statute when he valued plaintiff's interest in Stonecasters. This presents a question of statutory interpretation. Our primary goal in construing a statute is to effectuate the legislature's intent, giving the language its plain and ordinary meaning. *Khan*, 2012 IL 112219, ¶ 69.

¶ 25    As we explained in *Polsky v. BDO Seidman*, 293 Ill. App. 3d 414, 424 (1997): "[B]y its plain words, section 13-214.2(a) applies to actions based on tort, contract, or otherwise arising from acts or omissions in the performance of professional services involving accounting. This is broad language." Plaintiff, by contrast, advances a narrow interpretation of the term "professional services." Emphasizing that a person need not be a CPA to conduct a business valuation, plaintiff suggests that "professional services" means services that accountants, *and only accountants*, may perform. He cites no authority to support this novel proposition. His argument immediately falls apart when we consider that the two-year statute of limitations has been held to apply to actions arising from an accountant's preparation of income tax returns. See, *e.g.*, *Khan*, 2012 IL 112219, ¶¶ 66, 68. As with business valuations, Illinois law does not require one to be a CPA to prepare tax returns. See 225 ILCS 450/8.05(a)(3), (b)(3) (West 2016).

¶ 26    Interestingly, plaintiff does not dispute that many accountants offer business valuation services to their clients. Indeed, in light of the "increasing numbers of [its] members *** who are performing business valuation engagements or some aspect thereof," the AICPA enacted standards that its members must follow when conducting business valuations. Am. Inst. of Certified Pub. Accountants, Statements on Standards for Valuation Services § 100, Foreword (June 2007), https://www.aicpa.org/interestareas/forensicandvaluation/resources/standards /downloadabledocuments/ssvs_full_version.pdf [https://perma.cc/ZGM7-7VWR]. Modica indicated in his report that he followed those standards—along with NACVA's standards and the guidelines set forth by the Internal Revenue Service—when he valued plaintiff's interest in Stonecasters.

¶ 27    Plaintiff nevertheless insists that Modica was wearing his "appraisal hat" and not his "accountant hat" when he performed the business valuation in question. This argument is unavailing. The legislature recognizes that accountants may provide any number of services, some of which may overlap with services provided by other professionals. Section 8.05 of the Illinois Public Accounting Act states as follows:

"(a) Accountancy activities are services performed by a CPA, including:

(1) signing, affixing, or associating the names used by a person or CPA firm to any report expressing an assurance on a financial statement or disclaiming an opinion on a financial statement based on an audit or examination of that statement or to express assurance on a financial statement;

(2) other attestation engagements not otherwise defined in paragraph (1); or

(3) *offering to perform or performing one or more types of the following services involving the use of professional skills or competencies: accounting, management, financial or consulting services*, compilations, internal audit,

preparation of tax returns, furnishing advice on tax matters, bookkeeping, or representations of taxpayers; this includes the teaching of any of these areas at the college or university level.

(b) *If offering or performing accountancy activities using the CPA title set forth in paragraphs (1), (2), and (3) of subsection (a) of this Section, then*:

(1) the activities identified in paragraph (1) of subsection (a) may only be performed by licensed CPAs;

(2) the activities identified in paragraph (2) of subsection (a) may only be performed by licensed or registered CPAs; and

(3) *the activities identified in paragraph (3) of subsection (a) are not restricted to licensed or registered CPAs, subject to the provisions of Section 9 of this Act*." (Emphases added.) 225 ILCS 450/8.05 (West 2016).

In *Brunton v. Kruger*, 2015 IL 117663, ¶ 21, our supreme court said that the list of accounting functions in section 8.05(a) was not intended to be exhaustive. As Modica notes, the valuation services that he provided in connection with the present case arguably constituted "financial or consulting services" under section 8.05(a)(3). The broader point, however, is that an accountant does not necessarily stop being an accountant simply because he or she offers services that nonaccountants might also be qualified to provide. Given that the legislature recognizes that an accountant's services may overlap with the services provided by nonaccountants, it seems certain that, had the legislature intended for the term "professional services" in section 13-214.2(a) of the Code to mean services that only an accountant is qualified to provide, it would have said so explicitly.

¶ 28    As Modica points out, the court in *Heaton & Eadie Professional Services Corp. v. Corneal Consultants of Indiana, P.C.*, 841 N.E.2d 1181 (Ind. Ct. App. 2006), rejected an argument that was very similar to the one that plaintiff advances here. In doing so, the court reasoned that "[b]usiness valuations under repurchase agreements *** commonly call for the employment of a skill-set unique to accountants." *Heaton & Eadie*, 841 N.E.2d at 1187. According to the court, "[w]hether these skills are best classified as accounting/auditing, management advisory, financial advisory, or consulting services is irrelevant to the matter at hand because each technical rubric falls within the practice of accountancy." *Heaton & Eadie*, 841 N.E.2d at 1187. Thus, the court concluded, an accounting firm had provided " 'professional accounting services' " within the meaning of Indiana's statute of limitations (see Ind. Code § 25-2.1-15-1 (2004)) when the firm determined the value of an employee's interest in a company. *Heaton & Eadie*, 841 N.E.2d at 1187. Although plaintiff is correct that Indiana's statute of limitations is not identical to Illinois's statute, and although he insists that the accountant in *Heaton & Eadie* performed certain tasks that Modica did not, we believe that *Heaton & Eadie* provides additional support for our conclusion that business valuation activities fall comfortably within the scope of an accountant's "professional services" for purposes of section 13-214.2(a) of the Code. Indeed, like the Court of Appeals of Indiana, we have previously recognized that accounting "is essentially all that is involved in a valuation" of a closely-held business and that "valuation is merely a small part of the larger discipline of accounting." *In re Marriage of Olson*, 223 Ill. App. 3d 636, 645-46 (1992).

¶ 29    Plaintiff imagines a scenario where an accountant is also an electrician or a plumber and causes an injury to another while serving in one of those latter capacities. The analogy that plaintiff draws does not support his interpretation of the statute. If, for example, an electrician

damaged a client's home due to faulty wiring and then attempted to invoke the statute of limitations applying to the provision of professional services as an accountant, that would be a much different case from the one at bar. For one thing, in that situation, the distinction between the "accountant hat" and the "electrician hat" would be much more pronounced. The provision of services as an electrician certainly bears no resemblance to the "accountancy activities" listed in section 8.05 of the Illinois Public Accounting Act. We also highly doubt that the AICPA has promulgated standards for accountants who moonlight as electricians.

¶ 30    During oral argument, plaintiff maintained that it would be "unfair" for Modica to invoke the two-year statute of limitations here if a business valuator who was not an accountant could not do the same. Plaintiff's contention in this respect is undeveloped and unpersuasive. As explained above, upon considering the plain language of section 13-214.2(a) of the Code, it is apparent that the legislature intended for this limitations period to apply broadly to accountants providing professional services. Any concerns about the wisdom or fairness of applying a different limitations period to professionals who are not accountants would be more properly directed to the legislature.

¶ 31    We thus hold that the two-year statute of limitations contained in section 13-214.2(a) of the Code applies to plaintiff's professional negligence claim against Modica.

¶ 32                         B. Application of the Discovery Rule

¶ 33    The question becomes whether plaintiff's claim against Modica was untimely as a matter of law. Plaintiff maintains that, for purposes of section 13-214.2(a), it is the discovery of the accountant's wrongful conduct—rather than the discovery of some other party's wrongful conduct or the discovery of an injury—that triggers the two-year statute of limitations. In accordance with that view, plaintiff argues that his claim against Modica, which he filed on October 27, 2017, was timely, as he did not know until July 21, 2017, that "Modica and Honold had secretly devised a plan to enable Modica to value Plaintiff's 11½ percent interest without consideration of prior sales." Until then, plaintiff explains, he reasonably believed that "the only parties involved in wrongful conduct were Stonecasters and its president Frank Honold." Plaintiff submits that the trial court improperly dismissed his claim against Modica where there was a question of fact as to when he discovered or should have discovered the claim.

¶ 34    Modica responds that a plaintiff need not be aware of the full extent of his injuries, or even that there was an actionable wrong, for the statute of limitations to start running. Instead, Modica emphasizes, once a plaintiff is on inquiry notice, he is obligated to conduct an investigation to ascertain all potentially liable parties. Modica argues that, when plaintiff disagreed with the valuation report that he received in January 2015, he was aware of his injury and was also "on inquiry notice to investigate further." At the very least, Modica asserts, the statute of limitations began to run by June 26, 2015, when plaintiff sued Stonecasters and challenged in his complaint the accuracy of Modica's valuation. Modica further notes that plaintiff ultimately alleged in his second amended complaint that Modica's failure to obtain adequate documentation before completing the valuation was in itself a breach of the standard of care. Thus, Modica says, an "investigation was not even necessary" with respect to plaintiff's professional negligence claim. Under all of these circumstances, Modica submits that the professional negligence claim was untimely as a matter of law.

¶ 35    If the statute of limitations were to be applied mechanically, the limitations period could expire before a plaintiff even knew of his or her cause of action. *Khan*, 2012 IL 112219, ¶ 20.

The "discovery rule," developed by case law, is intended to ameliorate those potentially harsh results. *Khan*, 2012 IL 112219, ¶ 20. The effect of the rule "is to postpone the start of the period of limitations until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused." *Khan*, 2012 IL 112219, ¶ 20. At that point, the injured person is charged with a duty to "inquire further as to the possible existence of a cause of action." *Khan*, 2012 IL 112219, ¶ 20. The term "wrongfully caused" is not a term of art, and it does not mean that the plaintiff must have either knowledge of the existence of a cause of action or knowledge of negligent conduct. *Khan*, 2012 IL 112219, ¶ 22. A limitations period may commence even though the plaintiff is not yet aware of the full extent of his or her injures. *Khan*, 2012 IL 112219, ¶ 22. The question of when the plaintiff should have reasonably known both of the existence of an injury and that it was wrongfully caused generally presents an issue of fact, " 'unless the facts are undisputed and only one conclusion may be drawn from them.' " *Khan*, 2012 IL 112219, ¶ 21 (quoting *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981)).

¶ 36 Plaintiff does not deny that he was aware of his injury in January 2015 when he received Modica's report, which valued plaintiff's interest in Stonecasters at significantly less than what he believed was appropriate. The parties disagree, however, as to when plaintiff knew or should have known that his injury was wrongfully caused. Plaintiff asks us to focus on when he knew or should have known that Modica wrongfully caused his injury, as opposed to when he knew or should have known that Stonecasters or Honold caused his injury. Although Modica cites federal case law calling plaintiff's approach into question (see *Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d 1063, 1065 (7th Cir. 2000) (determining that a litigant was under the "misconception *** that the period of limitations starts defendant-by-defendant, rather than injury-by-injury")), even under plaintiff's approach, the only conclusion that may be drawn from the record is that plaintiff was on inquiry notice as to his claim against Modica by June 26, 2015.

¶ 37 The record indicates that, in February 2015, plaintiff's own "Qualified Appraiser," Hoffer, reviewed Modica's valuation report. Hoffer then sent Modica an e-mail on plaintiff's behalf asking questions about the report. Despite the exchange of an e-mail and a letter between Hoffer and Modica in February 2015, plaintiff initially was convinced that Stonecasters was solely responsible for the low valuation by refusing to provide Modica with requested documentation.

¶ 38 To that end, on June 26, 2015, plaintiff filed his original complaint against Stonecasters. Although plaintiff placed the blame on Stonecasters, he specifically alleged that Modica failed to determine the fair market value of the subject ownership interest ("Stonecasters' refusal and failure to provide to the expert the requested and relevant documentation resulted in the valuation expert failing to fairly determine the proper fair market value of the Plaintiff's termination membership interest under the terms of the [employment agreement]."). Plaintiff also complained that Modica "attempted to value Plaintiff's eleven and one-half percent (11½%) interest in Stonecasters without consideration of the [employment agreement], the company's forecasts and projections, and without other substantive requested data that was available to Stonecasters but withheld from the expert." Plaintiff further alleged that Stonecasters unfairly manipulated and withheld information from Modica before using Modica's "distorted opinion of value" to deny plaintiff fair payment for his ownership interest.

¶ 39     Despite asserting as early as June 2015 that Modica inaccurately valued his interest in Stonecasters, plaintiff insists that it was not until July 2017, when he learned of the e-mails that Modica and Honold exchanged in December 2014, that he had reason to suspect that Modica engaged in any wrongful conduct. Certain of the allegations of professional negligence in plaintiff's second amended complaint, however, pertained to conduct that plaintiff knew about long before July 2017. For example, plaintiff alleged that Modica violated NACVA standards by (1) completing a valuation before obtaining the documentation he requested, (2) completing a valuation without obtaining sufficient data regarding Stonecasters' financial status, (3) misrepresenting in his report that he considered prior sales of company stock, despite indicating later in the report that he did not consider any such sales, and (4) refusing to consider all of Stonecasters' assets.

¶ 40     It was never a secret that Modica completed his valuation before he received all of the information that he requested from Stonecasters. Plaintiff also knew or should have known when he received the January 2015 report that Modica did not consider prior sales of company stock, as this was stated clearly in the report. Moreover, although plaintiff criticized Modica for failing to account for all of the assets that were observable during his tour of Stonecasters' facility, the information underlying this particular allegation of negligence was available to plaintiff from the report itself. Specifically, the report indicated that Modica had toured the facility and had considered only a few of Stonecasters' fixed assets. Hoffer even questioned Modica in February 2015 as to whether there might have been other assets that were not considered. We would be hard-pressed to say that plaintiff was *not* on inquiry notice when his own accountant was inquiring as to the propriety of Modica's methodology. Although plaintiff claims that he did not know the true circumstances surrounding Stonecasters' failure to provide documentation until he discovered the December 2014 e-mail exchange, as noted above, a plaintiff who is on inquiry notice does not need to know the full extent of his injury before the statute of limitations starts to run. *Khan*, 2012 IL 112219, ¶ 22.

¶ 41     Plaintiff seems to suggest that the statute of limitations did not start to run until he knew that Modica committed professional negligence. For example, in his reply brief, plaintiff asserts: "Defendant's brief incorrectly argues that Plaintiff's knowledge of a breach of contract by Stonecasters at the time Plaintiff filed his Complaint in June of 2015 equates with knowledge that Defendant Modica had breached his duties under NACVA standards." To the extent that plaintiff suggests that it was his knowledge of Modica's breach of applicable professional standards that triggered the statute of limitations, he is mistaken. See *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673 (1997) (rejecting a plaintiff's argument that it could not have known of its accountant's negligence until it received a professional opinion to that effect from a different accountant). Instead, "when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed." *Nolan*, 85 Ill. 2d at 171.

¶ 42     Plaintiff questions what more he could have done between the time he filed his original complaint against Stonecasters and the time he discovered the December 2014 e-mails. One action he could have taken was to name Modica as a respondent in discovery. See 735 ILCS 5/2-402 (West 2016). That would have allowed plaintiff to use the full panoply of discovery tools to continue investigating Modica's valuation methodology while leaving open the possibility of converting him to a defendant if there was probable cause to do so. Given that

plaintiff believed all along that Modica's valuation was flawed, the law required plaintiff to take reasonable measures to investigate all of his potential claims. Had plaintiff named Modica as a respondent in discovery when he sued Stonecasters, plaintiff likely would have discovered the December 2014 e-mails much earlier than he ultimately did.

¶ 43 We find *Dancor* instructive. In that case, in October 1990, the plaintiff company filed a lawsuit in federal court against a former employee who embezzled company funds. *Dancor*, 288 Ill. App. 3d at 668-69. In March 1993, the plaintiff filed an action in state court against its accountant, alleging breach of contract and professional negligence for failing to detect the embezzlement from January 1987 through August 1990. *Dancor*, 288 Ill. App. 3d at 668. The appellate court affirmed an order dismissing the state court action based on the two-year statute of limitations. *Dancor*, 288 Ill. App. 3d at 674. The court determined that the statute began to run when the plaintiff filed its complaint against the former employee in federal court. *Dancor*, 288 Ill. App. 3d at 674. The court emphasized that the same allegations of fraudulent transactions that were detailed in the federal complaint were later used to support the allegations against the accountant. *Dancor*, 288 Ill. App. 3d at 674. The court explained that the paper trail that formed the basis of the action against the former employee presented the plaintiff with "sufficient knowledge to cause it to inquire further of a possible actionable wrong by [the accountant]" in failing to detect those irregularities. *Dancor*, 288 Ill. App. 3d at 674. In other words, although the plaintiff might not have known in October 1990 that its accountant violated the standard of care, the plaintiff had knowledge that was sufficient to put it on notice of the accountant's possible invasion of the plaintiff's legally protected rights. *Dancor*, 288 Ill. App. 3d at 675. The court also rejected the plaintiff's argument that the statute of limitations was tolled due to fraudulent concealment. According to the court, although there was conflicting evidence as to when the plaintiff received all of the relevant records, the information that the plaintiff possessed by October 1990 put it on notice of its claim; the plaintiff could have obtained any missing information either by moving to enforce a subpoena that it had issued in connection with the federal litigation or by inspecting documents that were in the possession of an assistant state's attorney. *Dancor*, 288 Ill. App. 3d at 675-77.

¶ 44 As in *Dancor*, the record here leaves no doubt that, no later than when plaintiff filed his original complaint against Stonecasters on June 26, 2015, he was well aware of his injury and had sufficient information to suspect that Modica might have violated his legally protected rights. By that point, the burden was on him to inquire further to determine whether Modica had committed an actionable wrong. Plaintiff did not bring his professional negligence claim against Modica until October 27, 2017, more than two years later. Accordingly, the court properly dismissed count III of the second amended complaint as time-barred.

¶ 45                                    III. CONCLUSION
¶ 46 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 47 Affirmed.